

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ANGEL ALVAREZ,

Plaintiff,

- against -

THE CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, P.O. DOUGLAS A BRIGHTMAN, P.O. THOMAS M. COZART, SGT. PAUL M. KERRIGAN, P.O. MICHAEL T. TEDESCHI, P.O. TIFFANY JEFFRIES, P.O. JOSEPH GREEN, SGT. PHILIP TERPOS, DETECTIVE DANIEL HULL, DETECTIVE ROBERT GIBBONS, POLICE OFFICER JOHN DOES 1-19, and SUPERVISORY POLICE OFFICERS RICHARD ROES 1-19, each in their individual and official capacities,

Defendants.

---

Civil Action No. 11 CIV 5464 (LAK)

**FIRST AMENDED COMPLAINT**

Jury Trial Demanded

---

## NATURE OF THE ACTION

1.     This is a civil action seeking damages against defendants for committing acts, under color of law, which deprived plaintiff of rights secured under the Constitution and laws of the United States and the State of New York; for conspiring for the purpose of impeding and hindering the due course of justice, with intent to deny plaintiff of equal protection of laws; and for refusing or neglecting to prevent such deprivations and denials to plaintiff.

2.     Plaintiff ANGEL ALVAREZ's rights were violated when officers of the NEW YORK CITY POLICE DEPARTMENT ("NYPD") unjustly riddled plaintiff with bullets as he was attending a block party in Manhattan's Harlem neighborhood. Plaintiff miraculously survived despite the fact that he was left with as many as 27 bullet wounds.

3.     Plaintiff's rights were further violated when he was arrested and held for a total of 200 days in jail on account of a police version of the shooting which was roundly rejected by a

special grand jury in New York County.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to 42 U.S.C. §§ 1983, 1985 , 1986 and 1988 and the Fourth and Fourteenth Amendments to the Constitution of the United States.

5.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

6.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

7.      Venue is properly laid in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) in that, *inter alia*, the events giving rise to the claim occurred in the Southern District of New York.

## SUPPLEMENTAL JURISDICTION

8.      This Court has supplemental jurisdiction over plaintiff's claims herein under the Constitution and Laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

9.      Pursuant to New York State General Municipal Law § 50-e, plaintiff timely filed a Notice of Claim with the New York City Comptroller within ninety (90) days of the events herein complained of, and the Comptroller designated the claim as number 2010-PI-039653.

10.     More than thirty (30) days have elapsed since service of said notice of claim and adjustment or payment of the claims has been neglected or refused by defendant THE CITY OF NEW YORK (the "CITY").

11.     This action is commenced within one (1) year and ninety (90) days after the happening of the events upon which these claims arise.

12.     Defendant CITY conducted an examination of plaintiff pursuant to New York

State General Municipal Law § 50-h on or about April 20, 2011.

**JURY TRIAL DEMANDED**

13.     Plaintiff demands a trial by jury on each and every one of the claims pled herein.

**PARTIES**

14.     Plaintiff ANGEL ALVAREZ is a resident of Bergen County, New Jersey. At all relevant times herein, plaintiff was a resident of New York, New York.

15.     Defendant CITY is a municipal corporation duly organized and existing by virtue of the laws of the State of New York.

16.     The NYPD is the department of the CITY responsible for, among other things, arresting persons for offenses and maintaining custody over such persons prior to their initial appearance in court. At all times relevant hereto, the NYPD, together with the CITY, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel. In addition, at all relevant times, the NYPD, together with the CITY, was responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obeyed the constitutions and laws of the United States and of the State of New York.

17.     In addition to the facts alleged in the following paragraphs, the following defendants are all sued in their individual and official capacities and all acted within the scope of their employment and under color of state law, to wit, under color of statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or CITY.

18.     At all relevant times herein, defendant RAYMOND KELLY ("KELLY") was the commissioner of the NYPD.

19.     At all relevant times herein, defendant DOUGLAS BRIGHTMAN

("BRIGHTMAN") was a police officer employed by the NYPD and was acting in the capacity of agent, servant, and employee of the CITY.

20. At all relevant times herein, defendant THOMAS COZART ("COZART") was a police officer employed by the NYPD and was acting in the capacity of agent, servant, and employee of the CITY.

21. At all relevant times herein, defendant PAUL KERRIGAN ("KERRIGAN") was a police sergeant employed by the NYPD and was acting in the capacity of agent, servant, and employee of the CITY.

22. At all relevant times herein, defendant MICHAEL TEDESCHI ("TEDESCHI") was a police officer employed by the NYPD and was acting in the capacity of agent, servant, and employee of the CITY.

23. At all relevant times herein, defendant PHILIP TERPOS ("TERPOS") was a police sergeant employed by the NYPD and was acting in the capacity of agent, servant, and employee of the CITY.

24. At all relevant times herein, defendant TIFFANY JEFFRIES ("JEFFRIES") was a police officer employed by the NYPD and was acting in the capacity of agent, servant, and employee of the CITY.

25. At all relevant times herein, defendant JOE GREEN ("GREEN") was a police officer employed by the NYPD and was acting in the capacity of agent, servant, and employee of the CITY.

26. At all relevant times herein, defendant DANIEL HULL ("HULL") was a police detective employed by the NYPD and was acting in the capacity of agent, servant, and employee of the CITY.

27.     At all relevant times herein, defendant ROBERT GIBBONS ("GIBBONS") was a police detective supervisor employed by the NYPD and was acting in the capacity of agent, servant and employee of the CITY.

28.     The true names of defendants POLICE OFFICERS JOHN DOES 1-19 and SUPERVISORY OFFICERS RICHARD ROES 1-19 are not currently known to plaintiff. However, all of said defendants are employees or agents of the NYPD. Accordingly, said defendants are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York General Obligations Law § 50-k. The Law Department, then is hereby put on notice (a) that plaintiff intends to name said officers as defendants in an amended pleading once the true names of said defendants become known to plaintiff and (b) that the Law Department should immediately begin preparing their defense in this action.

## STATEMENT OF FACTS

## THE POLICE SHOOTING OF ANGEL ALVAREZ

29.     On August 8, 2010 at approximately 3:00 a.m., plaintiff was attending a block party cookout with hundreds of other people in the vicinity of the intersection of 144th Street and Lenox Avenue, in the Harlem neighborhood in the City, County and State of New York.

30.     At the aforementioned time and place, plaintiff became engaged in what he thought would be a fist-fight with a man named Luis Soto ("Soto").

31.     During said altercation with plaintiff, Soto produced a firearm and shot plaintiff with it.

32.     Shortly thereafter, and without probable cause or provocation of any kind, the defendants BRIGHTMAN, COZART, KERRIGAN and TEDESCHI (collectively the

"SHOOTING OFFICERS"), while acting as agents, servants and/or employees of the defendants CITY and NYPD, pointed their guns at plaintiff, opened fire, and shot the plaintiff multiple times, discharging 46 rounds at and into plaintiff, Soto, their fellow officers, and otherwise into the crowd of hundreds of people who were present.

33.     After the aforementioned shooting began, plaintiff collapsed to the ground.

34.     As plaintiff lay defenseless, the SHOOTING OFFICERS continued to fire bullets into him, striking him multiple times in the neck, arms, legs, buttocks, torso, and through the bottoms of his feet. Plaintiff tried to protect himself from the onslaught by squeezing himself into the fetal position.

35.     When the police shooting finally stopped, Soto was dead or dying, two officers, including defendant TEDESCHI had been hit, several bystanders were struck by gunfire, and plaintiff had sustained approximately 27 bullet wounds.

36.     Defendant BRIGHTMAN then approached plaintiff, kicked him in the head with a boot and verbally taunted him by stating, in substance, "You're gonna [sic] die.".

37.     Despite the fact that the SHOOTING OFFICERS' barrage killed Soto and nearly killed plaintiff, the police only recovered a single non-police firearm at the scene, an incongruous result.

38.     Shortly after the shooting, defendant BRIGHTMAN falsely told defendant TERPOS that plaintiff had fired a weapon at him.

39.     Defendant TERPOS, assisted by any or all of defendants POLICE OFFICERS JOHN DOE 1-19, subsequently handcuffed plaintiff by viciously jamming his knee into the back of plaintiff's neck and wrenching his arms behind his back, further exacerbating the injuries he had sustained by the shooting.

40.     Thereafter, plaintiff was placed in an ambulance and transported to Harlem Hospital.

41.     Meanwhile, numerous police officers descended on the scene of the shooting.

42.     But these officers, including defendants POLICE OFFICERS JOHN DOE 1-19 and SUPERVISORY OFFICERS RICHARD ROE 1-19, utterly failed to preserve and gather evidence that would have helped prove plaintiff ALVAREZ's innocence. Medical professionals removed plaintiff's t-shirt while police officers were monitoring him and those officers either failed to secure and voucher it for analysis or intentionally destroyed it. After all, the t-shirt, which was riddled with bullet holes and would obviously have been a valuable source of forensic and ballistic evidence, simply disappeared.

43.     The single non-police firearm recovered from the scene of the aforementioned police shooting did not belong to plaintiff, and plaintiff did not intentionally discharge or possess said firearm with criminal intent at any time.

44.     Shortly after the shooting incident, defendant HULL was assigned as a lead detective charged with investigating the shooting.

45.     Defendant GIBBONS was designated as HULL's supervisor.

46.     In the days following the shooting incident, the CITY and NYPD began a media campaign attempting to demonize plaintiff in the public eye and to justify their wrongful actions.

47.     Specifically, on August 8 and August 9, 2010, long before all of the evidence had been collected and analyzed, defendant KELLY and the Mayor of New York City, the Hon. Michael Bloomberg, announced at press conferences that plaintiff shot and killed Soto, and then proceeded to fire a weapon at police.

48.     Defendant KELLY later retracted those factually false statements only when

irrefutable evidence showed that one of the SHOOTING OFFICERS, not plaintiff, had killed

Soto and that defendant TEDESCHI had actually been shot by defendant BRIGHTMAN, not

plaintiff.

49.     As this was happening, on or about August 9, 2010, defendants POLICE

OFFICERS JOHN DOE 1-19 acting at the behest of and with the approval of SUPERVISORY

OFFICERS RICHARD ROE 1-19, obtained a search warrant of plaintiff's family's residence at

2979 Eighth Avenue in Manhattan.  The warrant, which was executed that week, purported to

seek evidence of ownership of the non-police firearm recovered at the scene.  The search for

evidence within the scope of the warrant proved fruitless.

50.     However, in their dogged determination to further prejudice the public against

plaintiff and to potentially hinder plaintiff's ability to defend himself against future criminal

charges, defendant HULL and defendants POLICE OFFICERS JOHN DOE 1-19 acting at the

behest of and with the approval of defendant GIBBONS and SUPERVISORY OFFICERS

RICHARD ROE 1-19, seized approximately $87,000 in cash from inside the Alvarez family

apartment. Police officers also recovered empty plastic bags containing trace amounts of

marijuana and cocaine residue from inside the apartment.  The NYPD then issued a press release

about these seized items in a deliberate and baseless attempt to portray plaintiff as a drug dealer.

However, neither plaintiff nor any of the occupants of the apartment were ever charged with any

crime in connection with the execution of said search warrant.[1]

51.     Later that week, in the early morning hours of August 14, 2010, plaintiff woke up

---

[1] The NYPD repeatedly refused to return this money despite a written release from the New York County District Attorney's Office and a written assurance from the NYPD Legal Bureau that said money would be made available for release at the NYPD Property Clerk's Office. Finally, by an order of the Hon. Gregory Carro of the New York State Supreme Court, Criminal Term, County of New York, the property clerk of the New York City Police Department was ordered to return the money to plaintiff.  Plaintiff subsequently received a reimbursement check.

in the intensive care unit of Harlem Hospital, his right arm throbbing and handcuffed to the bed.

52. In furtherance of their scheme to justify their completely unwarranted use of force and against the indication of virtually all available evidence, the defendants POLICE OFFICERS JOHN DOE 1-19 with the consent and approval of defendants SUPERVISORY OFFICERS RICHARD ROE 1-19, arrested plaintiff at Harlem Hospital and with the cooperation and aid of the SHOOTING OFFICERS, TERPOS, GREEN, JEFFRIES, HULL, and GIBBONS falsely charged him with the attempted murder of a police officer. At that time, plaintiff still had fresh bullet wounds in his body and was dressed in sanitary hospital garb.

53. POLICE OFFICERS JOHN DOE 1-19 acting at the behest of SUPERVISORY OFFICERS RICHARD ROE 1-19 then forced plaintiff to the 33rd NYPD precinct, placed him in an unsanitary cell and denied him access to the care of a licensed physician. After a visit to the office of the New York County District Attorney later that day, plaintiff was transported to another NYPD precinct and forced to spend the night in an unsanitary cell where he was denied a bed.

54. Throughout the entire period between plaintiff's removal from Harlem Hospital and his transport into the custody of the New York City Department of Corrections, he repeatedly asked the police to take him to a secure and sanitary location so he could receive treatment for his substantial injuries. Each of these requests was summarily denied.

## THE CRIMINAL PROCEEDINGS AGAINST PLAINTIFF

55. Next, the defendants conspired to shield themselves from liability, embarrassment, and charges of misconduct by wrongfully and falsely convincing the New York County District Attorney's Office that there was at least reasonable cause to believe that plaintiff was guilty of a crime associated with the shooting.

56.     To that end, on August 15, 2010, an officer of the NYPD attested to a felony complaint filed in New York County Criminal Court ("Complaint") charging plaintiff with two counts of criminal possession of a weapon in the second degree and one count of criminal possession of a weapon in the third degree pursuant to Article 265 of New York State Penal Law, under the theory that plaintiff possessed a firearm with the intent to use it unlawfully against Soto and/or officers of the NYPD. The deponent of said felony complaint relied upon a falsified version of events provided to him by, among other NYPD officers, defendants GREEN and JEFFRIES.

57.     On August 16, 2010, plaintiff appeared before the Hon. Evan Mandelbaum in the Criminal Court of the City of New York, County of New York, part AR1. Based on the District Attorney's bail application, which was comprised in large part of the defendants' fabricated version of the August 8th shooting, Judge Mandelbaum remanded plaintiff to the custody of the New York City Department of Corrections without setting any amount of bail.

58.     On August 19, 2010, a preliminary hearing pursuant to Article 180 of the New York State Criminal Procedure Law was held in New York State Supreme Court, part 61 before the Honorable Bonnie Wittner.

59.     The testimony presented at the hearing consisted almost entirely of the false police account which would later be flatly rejected by the grand jury; NYPD officers, including defendant TERPOS, continued to maintain that plaintiff used the non-police weapon recovered at the scene of the aforementioned shooting to fire at defendant BRIGHTMAN.

60.     At the conclusion of the hearing, Judge Wittner ordered plaintiff be held in custody for a period of 45 days.

61.     Fearing that the truth about the police shooting would never come to light unless

the District Attorney's office was given ample time to complete its investigation, the defendant remained incarcerated after the expiration of the 45-day period so as to have the ability to testify and present independent civilian eyewitnesses in his defense before a special grand jury, which would be convened for the express purpose of investigating the August 8th police shooting.

62.     On or around December 13, 2010, that special grand jury was convened to investigate the August 8th police shooting and consider whether any charges should be leveled against plaintiff.

63.     The plaintiff testified in his own defense before the grand jury.

64.     Sixty police officers, including defendants TEDESCHI, BRIGHTMAN, KERRIGAN, HULL, and COZART also testified before the grand jury.

65.     After hearing all of the evidence, including the testimony of civilian witnesses, the special grand jury voted a "no true bill" with respect to plaintiff and refused to charge plaintiff with any crime at all.

66.     On March 2, 2011, plaintiff appeared before the Hon. Gregory Carro. The District Attorney announced the grand jury's decision and plaintiff was finally released.

67.     Shortly thereafter, District Attorney Cyrus R. Vance, Jr. issued a press release where he made public his conclusion that the shooting was initiated by Soto when "[he] removed a gun from his pants pocket and shot Alvarez multiple times."[2]

68.     All told, plaintiff wrongfully spent 200 days in jail as a direct result of the now completely discredited police version of events of the night of August 8, 2010.

### PLAINTIFF'S INJURIES SUSTAINED AS A RESULT OF THE SHOOTING

69.     As a result of the aforementioned police shooting, plaintiff has suffered numerous

---

[2] Press Release, Statement by District Attorney Vance Regarding August 8, 2010 Police-Involved Shooting (March 15, 2011), *at* http://manhattanda.org/node/728/print.

permanent physical injuries, emotional and psychological damage, has been required to undergo multiple surgeries, and will require medical care and psychological therapy on account of the injuries he sustained for the foreseeable future.

70.    Said physical injuries, include, *inter alia*, bullet wounds in his left and right feet, left ankle, right shin, right inner thigh, left buttock, lower back, stomach, chest, side, left forearm, right arm, right shoulder, neck, and jaw. Numerous bullets or bullet fragments remain lodged in his body.

## CLAIMS FOR RELIEF

### COUNT I

### (42 U.S.C. § 1983 – Police Brutality)

71.    Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

72.    Defendant CITY (via the NYPD), including but limited to the SHOOTING OFFICERS and TERPOS under the color of law and within the scope of their authority, assaulted and battered the plaintiff in violation of the civil rights of the plaintiff, more particularly, 42 U.S.C. § 1983 as well as other applicable federal and state laws, including the Fourth and Fourteenth Amendments to the United States Constitution.

73.    The deprivation by the defendants of plaintiff's civil rights was a result of the SHOOTING OFFICERS and TERPOS acting under color of law and within their authority as law enforcement officers within the employ of the defendant CITY.

74.    The SHOOTING OFFICERS conspired with one another as well as with TERPOS, GREEN, JEFFRIES, HULL, GIBBONS, POLICE OFFICERS JOHN DOE 1-19 and SUPERVISORY OFFICERS RICHARD ROE 1-19, to cover up the wrongful nature of the

shooting of plaintiff and fabricated a version of events leading up to and resulting in the shooting of the plaintiff. Said conspiracy worked to deprive plaintiff of his constitutional rights, including the rights to be free from the intentional use of unreasonable force, to be free from unreasonable search and seizure, and unreasonable and excessive force.

75.     The defendants CITY (via the NYPD), including but not limited to the SHOOTING OFFICERS, TERPOS, GREEN, JEFFRIES, HULL, GIBBONS, POLICE OFFICERS JOHN DOE 1-19 and SUPERVISORY OFFICERS RICHARD ROE 1-19 were not acting with immunity when they deprived the plaintiff of his civil rights.

76.     At no time during the events described above or as the events occurred did the defendant officers have probable cause to discharge their firearms at plaintiff ANGEL ALVAREZ.

77.     At no time, either at the time and place of the police shooting or at any later time and place, did plaintiff attempt to offer violence to any of the defendant officers.

78.     The aforementioned shooting was done knowingly, intentionally and willfully.

79.     The aforementioned shooting was done negligently and recklessly.

80.     The aforementioned shooting was done without reason or provocation.

81.     By reason of said shooting, plaintiff was caused to suffer severe physical injuries, including pain and suffering, emotional and psychological distress and horror.

**COUNT II**

**(42 U.S.C. § 1983 – False Imprisonment)**

82.    Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

83.    There was no warrant for the arrest of plaintiff on August 8, 2010. The arrest of plaintiff was without reasonable grounds for anyone to believe plaintiff had committed an offense and each of the defendants who participated in the arrest and detention process knew they were without probable cause to arrest plaintiff.

84.    Neither at the time of the arrest, nor at any other time was plaintiff informed of the grounds for said arrest. No complaint, information, or indictment was ever sworn against plaintiff alleging offenses occurring prior to the moment defendants announced to plaintiff that he was under arrest.

85.    At no time during the events described above or as the events occurred did the defendant officers have probable cause for the arrest of plaintiff ANGEL ALVAREZ, and there was no legal cause or excuse for his seizure.

86.    In the days following the August 8, 2011 shooting, the CITY and the NYPD intentionally and recklessly perpetuated falsehoods associated with plaintiff's arrest by appearing on television and stating that plaintiff had shot at police officers.

87.    Plaintiff was arrested shortly after the shooting and remained incarcerated based on the fabrication of the defendants until a New York County grand jury cleared him.

88.    As a result of their concerted, unlawful and malicious arrest of plaintiff, each of the defendants, acting under color of law and within the scope of their authority, deprived the plaintiff of his liberty without due process of law and deprived him of equal protection of the laws, in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

89.     As a result of their concerted, unlawful and malicious detention and confinement of the plaintiff, each of the defendants intentionally, or with deliberate indifference and callous disregard of plaintiff's rights, deprived plaintiff of his liberty without due process of law and deprived him of equal protection of the laws, in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

### COUNT III

### (42 U.S.C. § 1983 – Monell claim)

90.     Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

91.     All of the acts and omissions by the SHOOTING OFFICERS, TERPOS, GREEN, HULL, GIBBONS, JEFFRIES, POLICE OFFICERS JOHN DOE 1-19 and SUPERVISING OFFICERS RICHARD ROE 1-19 (hereinafter the "INDIVIDUAL POLICE DEFENDANTS") described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY, its agency the NYPD and defendant KELLY.

92.     Defendant CITY and the NYPD, by defendant KELLY and their other policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

93.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of

ranking officers of the NYPD including defendant KELLY.

94.     The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

a. Fabricating evidence in order to justify (or attempt to justify) otherwise suspicionless arrests;

b. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

c. Failing to supervise, train and instruct officers in the phenomenon known as "contagious shooting."

d. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

e. Retaliating against officers who report police misconduct; and

f. Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

95.     The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

a. *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

b.  *Taylor-Mickens v. City of New York*, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

c.  *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on *Iqbal/Twombly* grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

d.  *Callaghan v. City of New York*, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, *to wit*, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[3]

e.  *Williams v. City of New York*, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

f.  *Dunlop v. City of New York*, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250

---

[3] For a description of this case and the nearly $1 million settlement, *see*, Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/19critical.html?_r=1.

(S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

g. *Carmody v. City of New York*, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

h. *MacNamara v. City of New York*, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

i. *McMillan v. City of New York*, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

j. *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

k. *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

l. *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

m. *Nonnemann v. City of New York*, 02-CV-10131 (JSR) (AJP), 2004 U.S. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's

suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

n.  *Richardson v. City of New York*, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

o.  *Barry v. New York City Police Department*, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

p.  *Walton v. Safir*, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

q.  *White-Ruiz v. The City of New York*, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

r.  *Ariza v. City of New York*, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a

widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department); and

s. *Sorlucco v. New York City Police Department*, 89-CV-7225 (CCH), 88 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her).

96. The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct, are further evidenced, *inter alia*, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[4]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

---

[4] Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

c.  In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New York*, 09 Civ. 00008 (E.D.N.Y.), in which he noted a "widespread […] custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[5]

d.  Defendant CITY's tacit condoning of and failure to supervise, discipline or provide remedial training when officers engage in excessive force is evidenced by its systematic disregard of the recommendations of the Civilian Complaint Review Board ("CCRB").  CCRB is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[6] When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during KELLY's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB

---

[5] Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[6] In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

in 2009.[7] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[8]

e.  Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month and for pushing officers to falsify official documents. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.
>
> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.
>
> Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[9]

97.  The existence of the aforesaid unconstitutional customs and practices, specifically

---

[7] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[8] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[9] Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

with regard to the practice or custom of failure to supervise, train and instruct officers in the phenomenon known as "contagious shooting," in which one individual firing on a given target can induce others to begin shooting, are further evidenced, *inter alia*, by the following:

a. On November 25, 2006, a group of five police officers fired 50 shots in a melee that occurred outside a Queens strip club killing Sean Bell and injuring Joseph Guzman and Trent Benefield.[10] *Bell v. The City of New York*, CV-07-2994 (E.D.N.Y. 2007) (lawsuit filed against CITY and NYPD alleging injuries caused by, *inter alia*, the contagious shooting of plaintiff by police officers.)

b. In 2006, five officers of the NYPD fired 26 shots to kill a pit bull in Bronx, New York; the officers hit the 45 pound dog with nine shots and three officers were struck by errant bullets in the ensuing frenzy.[11]

c. On January 8, 2005, eight officers of the NYPD fired 43 shots killing a man who was accused of shooting a co-worker and raping another. While the shooting in the Allen case may have been necessary to subdue plaintiff, the example is nonetheless one of contagious shooting.[12]

d. On February 5, 1999, an unarmed 22 year-old West African immigrant, Amadou Diallo, was gunned down by four officers of the NYPD in what can only be explained as "contagious shooting". The officers fired 41 shots, hitting Diallo with 19 of them.[13]

---

[10] For an overview of the facts in the Bell case, please see
http://topics.nytimes.com/top/reference/timestopics/people/b/sean_bell/index.html?inline=nyt-per

[11] Fernando Santos, *4 Officers Hurt (One by Pit Bull) as Police Fire 26 Shots to Kill Dog in Bronx*, The New York Times, July 24, 2006, *available at* http://www.nytimes.com/2006/07/24/nyregion/24pitbull.html

[12] William K. Rashbaum, *Police Say Man They Shot Terrorized 2 Co-Workers*, The New York Times, January 8, 2005, *available at* http://www.nytimes.com/2005/01/08/nyregion/08shot.html.

[13] Michael Cooper, *Officers in Bronx Fire 41 Shots, And an Unarmed Man Is Killed*, The New York Times, February 5, 1999, *available at* http://www.nytimes.com/1999/02/05/nyregion/officers-in-bronx-fire-41-shots-and-an-unarmed-man-is-killed.html

e. In February of 1995, officers fired 125 rounds in an attempt to stop a botched bodega robbery, despite the fact that suspects fired no shots. One police official at the time recalled, "They were shooting to the echo of their own gunfire."[14]

f. In December of 1994, "18 officers fired 247 rounds during a running shootout in a Queens street with a gunman who had already killed two people. A bystander was killed by police gunfire in that incident."[15]

98.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence, are further evidenced, *inter alia*, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[16]
>
> […]
>
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view

---

[14] Garry Pierre-Pierre, *Officers' Fast-Firing 9-mm. Pistol Concerns Police Leaders*, February 18, 1995, *available at* http://www.nytimes.com/1995/02/18/nyregion/officers-fast-firing-9-mm-pistol-concerns-police-leaders.html

[15] *Id.*

[16] Mollen Commission Report, p. 36.

falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[17]

    b.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[18] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.
>
> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.
>
> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[19]

    c.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of criminal charges in connection with

---

[17] Mollen Commission Report, pp. 40-41.

[18] Murray Weiss, *NYPD in a Liar Storm*, New York Post, October 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

[19] *Id.*

those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[20]

    d.   In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting

[20] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

pressured from headquarters," a police source told The Post.[21]
The officers were indicted for felony perjury, filing a false report and filing a false instrument.[22]

e.  In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[23] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant District Attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense." According to the attorney for the Patrolmen's Benevolent Association, disciplinary charges against the officer are pending.[24]

f.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and

---

[21] Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, available at http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[22] John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[23] In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, *available at* http://articles.nydailynews.com/2010-01-08/local/17943916_1_prostitution-charges-arrested

[24] *Id.*

the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[25]

99.     The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct, are further evidenced, *inter alia*, by the following:

a.   Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

b.   In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

c.   Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

100.    The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, KELLY.

101.    The aforementioned actions of the INDIVIDUAL POLICE DEFENDANTS resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members

---

[25] David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and KELLY who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

102.    All of the foregoing acts by defendants deprived plaintiff of federally protected rights, including, but limited to, the right:

    a.  Freedom from unreasonable searches and seizures of his person;

    b.  Freedom from arrest without probable cause;

    c.  Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

    d.  Freedom from deprivation of liberty without due process of law; and

    e.  The enjoyment of equal protection, privileges and immunities under the laws.

103.    Defendant CITY knew or should have known that the acts alleged herein would deprive plaintiff of his rights, in violation of the Fourth and Fourteenth Amendments to the

United States Constitution.

104.    Defendant CITY is directly liable and responsible for the acts of the INDIVIDUAL POLICE DEFENDANTS because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

105.    Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

106.    The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the INDIVIDUAL POLICE DEFENDANTS felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff, arrest plaintiff without probable cause. Pursuant to the aforementioned CITY policies, practices and/or customs, the INDIVIDUAL POLICE DEFENDANTS failed to intervene in or report other defendants' violation of plaintiff's rights.

107.     Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

108.     The actions of the INDIVIDUAL POLICE DEFENDANTS resulted from and were taken pursuant to the foregoing *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

109.     Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

110.     As a direct and proximate cause of the acts of all defendants as set forth above, plaintiff suffered physical injury, loss of income, medical expenses, and severe mental anguish in connection with the deprivation of this constitutional and statutory rights guaranteed by the fifth and fourteenth amendments of the constitution of the united states and protected by 42 U.S.C. § 1983.

**COUNT IV**

**(42 U.S.C. §§ 1983, 1986 – Failure to Intervene)**

111.     Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

112.     Each of the defendants had knowledge of the conspiracy to arrest and wrongfully deprive plaintiff of his constitutional and statutory rights as set forth above.

113.     Each of the defendants, through the exercise of reasonable diligence, had the power to prevent or aid in preventing such deprivation.

114.     Each of the defendants neglected or refused to prevent such deprivation.

115.     As a direct and proximate cause of the acts of each of the defendants as set forth above, plaintiff suffered physical injury, loss of income, medical expenses, and severe mental anguish in connection with the deprivation of this constitutional and statutory rights guaranteed by the fifth and fourteenth amendments of the constitution of the united states and protected by 42 U.S.C. § 1983.

## COUNT V

### (42 U.S.C. §§ 1985 – Conspiracy to Interfere with Civil Rights)

116.     Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

117.     Each of the defendants conspired for the purpose of depriving plaintiff the equal protection of the laws.

118.     Each of the defendants took an act in furtherance of the object of said conspiracy.

119.     As a direct and proximate cause of the acts of all defendants as set forth above, plaintiff suffered physical injury, loss of income, medical expenses, and severe mental anguish in connection with the deprivation of this constitutional and statutory rights guaranteed by the fifth and fourteenth amendments of the constitution of the united states and protected by 42 U.S.C. § 1983.

## COUNT VI

## (New York Constitution Art I, 11)

120. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

121. By the aforesaid acts, defendants have violated plaintiff's right to the equal protection laws under Article I, 11 of the New York State Constitution, thereby giving rise to a cause of action pursuant to that article.

122. The conduct and actions of the each of the defendants, acting under color of law, in assaulting, battering, falsely arresting, imprisoning, and using excessive force against plaintiff were done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of their acts, without lawful justification, and were designed to and did cause specific and serious bodily injury, mental and emotional harm, and pain and suffering in violation of the plaintiff's constitutional rights as guaranteed under the laws and Constitution of the State of New York. As a result of said actions, plaintiff was deprived of such rights, including, but not limited to, rights under Article I, 8-9 of the New York State Constitution guaranteeing freedom of expression and association, Article I, 12, guaranteeing protection against unlawful seizure of his person, Article I, 11, guaranteeing due process and equal protection under the law, and Article I, 15, guaranteeing protection from cruel and unusual punishment.

123. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## COUNT VII

## (Assault And Battery)

124.     Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

125.     By the actions described above, the SHOOTING OFFICERS, TERPOS, POLICE OFFICERS JOHN DOE 1-19, and SUPERVISORY OFFICERS RICHARD ROE 1-19 did inflict assault and battery upon plaintiff. The acts and conduct of these defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

126.     As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

127.     For all claims under New York State Law, defendants are jointly and severally liable to Plaintiff inasmuch as this action arises out of the exceptions set forth in 1602 subdivisions 5, 7 and 11 of the Civil Practice Law and Rules.

## COUNT VIII

### (False Arrest and Imprisonment)

128.     Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

129.     By the actions described above, each of the defendants caused to be falsely arrested or falsely arrested plaintiff, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

130.     The false arrest and confinement of the plaintiff occurred after he was shot

multiple times and sustained serious permanent personal injuries along with humiliation, shame, indignity, damage to reputation and credit and suffered emotional and physical distress and injuries.

131.    As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## **COUNT IX**

### **(Negligence)**

132.    Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

133.    Each of the defendants, jointly and severally, negligently caused injuries, emotional distress and damage to the plaintiff. The acts and conduct of the defendants were the direct and proximate cause of the injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

134.    As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## **COUNT X**

### **(Negligent Hiring and Retention)**

135.    Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

136.    The defendants CITY and NYPD did not exercise reasonable care and diligence in the selection, engagement, employment and training of its agents, servants, and employees and

were negligent in the hiring, training and retention of the INDIVIDUAL POLICE DEFENDANTS, so as to cause serious physical injury to plaintiff.

137. Such negligence consisted of negligence in training, hiring, supervision and retention of the INDIVIDUAL POLICE DEFENDANTS involved in this incident; in failing to observe the existing police department protocols for police officers/detectives designed to govern the use of deadly lethal force causing the serious injuries both physical and emotional resulting in serious and permanent physical injury and discrimination arising and resulting out of the aforementioned wrongful shooting of the plaintiff and further, deprived plaintiff's civil rights, privileges and immunities secured under the Constitutions of the United States Of America and State of New York; in failing to use care in the performance of police duties as reasonably prudent and careful police officers would have used in similar circumstances; in hiring and retaining persons who were unfit to serve as police officers/detectives; failing to properly investigate their background; failing to properly train and instruct police officers/detectives, especially regarding the abuse of power while in the field; failing to give police officers/detectives proper instructions on the use of force, use of firearms including proper discharge of said weapons; failing to give police officers/detectives proper training regarding the phenomenon known as "contagious shooting" in their training and instruction, more specifically with regard to their training as to the use of firearms in public; improperly supervising police officers/detectives in the field, including the police officers/detectives as well as in the staffing, administration and processing of persons suspected of violation of the criminal laws of the State of New York which allowed the shooting of the plaintiff, which resulted in the serious and permanent physical injuries plaintiff sustained.

138. The defendants CITY and NYPD, through their agents, servants, employees,

including but not limited to the SHOOTING OFFICERS were negligent, reckless and careless in shooting the plaintiff.

139.     The defendants CITY and NYPD had prior knowledge of the inappropriate, unlawful, and improper conduct of the INDIVIDUAL POLICE DEFENDANTS, and continued to employ them and allowed them to be in contact with the public at large.

## COUNT XI

### (Punitive Damages)

140.     Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

141.     The actions of all of the defendants herein above alleged were malicious, willful and grossly negligent.

142.     The defendants CITY and NYPD authorized, permitted and ratified the unlawful and negligent acts of the INDIVIDUAL POLICE DEFENDANTS.

143.     By reason of the foregoing, plaintiff demands judgment for punitive damages against the defendants CITY and the NYPD, including, but not limited to the INDIVIDUAL POLICE DEFENDANTS, in a sum exceeding the jurisdictional limits of all the lower courts.

144.     As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## COUNT XII

### (Intentional Infliction of Emotional Distress)

145.     Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

146. As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## COUNT XIII

## (Prima Facie Tort)

147. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

148. Defendants failed to adhere to proper police protocol prior to discharging their weapons.

149. As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**WHEREFORE**, plaintiff ANGEL ALVAREZ respectfully requests judgment upon all causes of action against Defendants as follows:

1. With respect to the defendant CITY and defendant NYPD:

a. Declaratory judgment declaring that Defendant CITY and defendant NYPD has violated the aforesaid statutes and constitutions.

b. Restitution to plaintiff of his rights, privileges, benefits and income which would have been received by him but for the defendants unlawful, wrongful, tortious, and unconstitutional conduct;

c. Compensatory damages in an amount to be determined by the court and jury;

d. Punitive damages in the amount to be determined by the court and jury

e. Reasonable attorney's fees, disbursements and costs of this action, pursuant to 42

U.S.C. § 1988;

    f.  All legal and statutory interest on sums awarded; and

    g.  Such other and further relief as this honorable court may deem just, proper and equitable

2.      With respect to each of the INDIVIDUAL POLICE OFFICERS:

    a.  Declaratory judgment declaring that the Defendants have violated the aforesaid statutes and constitutions;

    b.  Restitution to plaintiff of his rights, privileges, benefits and income which would have been received by them but for each defendant's unlawful, wrongful, tortuous, and unconstitutional conduct;

    c.  Compensatory damages in an amount to be determined by the court and jury;

    d.  Punitive damages in an amount to be determined by the court and jury;

    e.  Reasonable attorney's fees, disbursements, and costs of this action, pursuant to 42 42 U.S.C. § 1988;

    f.  All legal and statutory interest on sums awarded; and

    g.  Such other and further relief as this honorable court may deem just, proper and equitable.

Dated: New York, New York  
       May 1, 2012

GALLUZZO & JOHNSON LLP

By: _____  
    Matthew J. Galluzzo  
    matthew.galluzzo@gjllp.com

    48 Wall Street, 11th Floor  
    New York, New York 10005  
    Tel: (212) 918-4661  
    Fax: (646) 402-6429

*Attorneys for Plaintiff*